# GUENTHER v. METROPOLITAN RAILROAD COMPANY.*

STREET RAILWAYS; NEGLIGENCE; CONTRIBUTORY NEGLIGENCE; PROXIMATE CAUSE; DEATH BY WRONGFUL ACT.

1. When a street car has been stopped to take on passengers it is the duty of the conductor to watch both ends of the car and to see that all passengers are safely on before giving the signal to start; and he has no right to assume that all are equally strong and active and that the last one must be safely on because in his opinion sufficient time has been given; and the fact that the car is so crowded as to make it difficult or impossible for him to make the necessary observation while within the car is not only no excuse, but would seem to increase the burden of his duty because of the consequent impediment to rapid egress and ingress.

2. Where a person boarding a car grasped the bar or hand-rail in attempting to get on the car before it was put in motion, and, the car then starting, was dragged along the street and injured, it is a question of fact for the jury, and not of law for the court, whether his injuries were the result of his want of care in not releasing his grasp in time to prevent being so dragged. Whether he exercised the care reasonably to be expected of an ordinary person at the time is to be determined from all the surrounding circumstances, among which are the emergency under which he was called upon to act. (Following Washington & G. R. Co. v. Hickey, 5 App. D. C. 436.)

3. A case may be withdrawn from the jury, not only where the plaintiff's evidence is plainly insufficient to support a verdict, but also where the whole evidence, including that introduced by the defendant as well as the plaintiff, and offering no substantial dispute on material points, is of such conclusive character that the court, in the exercise of a sound discretion, would be compelled to set aside a verdict returned in opposition to it.

4. Where, in a suit against a street railway company by an administrator whose intestate was injured by the premature starting of a car of the defendant which the intestate was attempting to board, it appeared from the defendant's evidence that, before and at the time

*Carriers—Injury to Passenger Boarding Car.—As to liability of carrier for starting car before passenger is seated, see the full presentation of the authorities in editorial note to Louisville & N. R. Co. v. Hale, 42 L. R. A. 293; as to liability for injury to passenger in getting on or off moving street car, see editorial note to Jagger v. People's Street R. Co. 38 L. R. A. 786; on question of liability for injuries in getting on or off railroad trains, see editorial note to Carr v. Eel River & E. R. Co. 21 L. R. A. 354.

of the accident, the intestate had heart disease so far developed that. it would gradually have brought on a fatal hemorrhage at some indefinite future period, but that the final result of the disease was brought about or necessarily hastened by the accident, the proximate cause of the death of the intestate in contemplation of law is the injury so received, and not the disease; and in such a case where the trial court directed a verdict for the defendant, at the close of all of the evidence, and from the judgment which followed the plaintiff appealed, the evidence was reviewed, and *held* to raise a question to be determined by the jury whether the proximate cause of the death of the intestate was the wrongful act of the railway company or the pre-existing disease of the intestate.

5. In an action against a street railway company for damages for personal injuries, evidence offered by the defendant through its claim agent and another, to show that no reports of the accident had been made to the defendant by its employees, and that it had not been able to hear of anyone who knew anything about the accident, is inadmissible when objected to by the plaintiff.

6. In a personal injury case, expert testimony offered by the defendant. tending to show that the plaintiff's intestate died as a result of a pre-existing disease and not as a result of his injuries, is new matter, which the plaintiff is entitled to rebut. (Following *Robinson* v. *Parker*. 11 App. D. C. 132.)

No. 1383. Submitted March 23, 1904. Decided May 3, 1904.

HEARING on an appeal by the plaintiff from a judgment of the Supreme Court of the District of Columbia on a verdict directed by the court in an action to recover damages for the alleged negligent killing of the plaintiff's intestate. *Reversed.*

The COURT in the opinion stated the case as follows:

This action was begun by the administrator of Nelson J. R. Guenther's estate, on behalf of the intestate's widow and next of kin, to recover damages sustained by reason of his death from injuries received through the negligence of defendant.

The appeal is from the judgment for defendant entered on a. verdict returned in obedience to a peremptory order of the court.

The following is a substantial statement of the evidence on which the order to return the verdict was founded:

George Buckler testified that on November 30, 1898, he was a passenger on defendant's train of two cars going south on Ninth street in the city of Washington. He was standing on the rear platform of the rear car when it stopped at the corner of P street. Several ladies and the intestate were there to enter the cars. Intestate stepped back to permit the ladies to get on first and then undertook to get aboard. He grasped the upright rail and before he could get his foot on the platform the train started. He retained his hold on the upright and was dragged across P street to a point 25 or 30 feet beyond (about 100 feet) before the car could be stopped. The conductor was either about the middle of the forward car or on the platform when he signalled to start. Intestate was not thrown but dragged. He held to the rail and did not fall. Witness and two or three others took hold of intestate and tried to pull him on to the platform, but did not succeed until the car had stopped. He was "a very portly gentleman, rather hale and hearty in appearance, and witness judged him to be about fifty years old." Intestate was almost in a collapsed condition, red in the face and breathing laboriously, and could not speak at first. At Ninth and F streets intestate got out and was helped into Williams's drug store. On cross-examination he said the car had stopped at the usual place, at or near the north line of P street. The cars were then crowded, some passengers standing in the cars and on the platforms. Witness was near the left step leaning against the rear dashboard. Intestate took hold of the upright wooden handle at the end of the car with his right hand. Witness reached over and took him by the left shoulder. His feet were on the ground all the time the car was going, but one foot may have been on the step when the car stopped. The car stopped long enough at P street to admit all the passengers but intestate. Witness thought there were four or five others, and that two of these (ladies) got on the rear platform. Some may have gotten on the other platform. Deceased was standing by the side of the car and had hold of the upright with his right hand when the car started.

Witness Grace C. Montgomery testified that on the 30th of

November, 1898, she resided at 923 P street N. W., and was employed in the Treasurer's office in the United States Treasury Department; that she went to the office that day, leaving the house about half-past eight; that she went to the corner of Ninth and P streets to take the car; that she met the deceased coming out the front door, as she was going out the basement door, and they went to the car together; that she knew deceased very well; that he and his wife had lived at witness's house for about six years; that deceased was employed in the Postoffice Department at the time and was on his way to the office that morning; that deceased generally started out a little earlier than she did, but that morning they started at the same time and reached the corner of Ninth and P streets at the same time; that they waited there quite a while for the car; that witness judged from five to ten minutes; that the cars came along one right after the other for about three or four, or four or five cars, and they were crowded with people, and witness and Mr. Guenther did not attempt to get on; that when the next car came along witness thought that deceased must have thought he was late, and so he tried to get on that car, but witness did not, because the platforms were full; that deceased got on the car after somebody pulled him up on it; that witness and deceased were standing right in front of Hamline Church door, just north of P street, and he went across to get on the car; that the car always stopped on that side and that witness told him not to go and he said he would be late; that witness told him the car was still crowded and he being a stout man, there was not very much room for him, but that deceased started to get on the car; that the car stopped perfectly still, and there were three or four, perhaps five, ladies and one man at the other end; that they got on; that the conductor was near about the front door of the last car; that the front car was open and the last car was a box car; that deceased had on an overcoat, for it was cool, and he started to get on the car; that the conductor, being there, saw the people getting on the front part of the car, and deceased being a stout, short man, he did not look back at all to see him getting on; that witness was watching deceased at the time because she was

afraid he was going to get left; that he was not a very quick man, because he was stout; that he put his hand on the side of the car and he pulled himself up with his hand; that he did not get his feet on the steps of the car at all when the man jingled the bell and the car started off; that some one shouted and witness shouted; that "the conductor jingled the bell and the car started and we all shouted;" that witness saw the conductor when he rang the bell; that she was looking at him; that the car started immediately upon the ringing of the bell; that witness knows positively that the conductor did not see Mr. Guenther because he did not look back; that witness thinks there was no one getting on the back of the car except deceased; that witness thinks the gentleman who previously testified said he held on with the right hand, but witness remembers distinctly that he did not hold on with the right hand, that he held on with the left hand, and was swung around back of the tin piece that goes at the back of the car; that as he swung around some one grabbed him by the overcoat and held on to him; and they went across the Belt Line car track before the car stopped; that witness saw him when he was helped on the inside of the car and did not see him any more until next day, when he was very sick; that she went into his room and saw him; that after the accident witness saw him sometimes two or three times a day; that she helped Mrs. Guenther nurse him; that the accident happened on the 30th day of November, 1898; that deceased died on the 16th day of January, 1899; that witness was well acquainted with the deceased for some years prior to the accident; that he always seemed well when at witness's house; that she never heard him complain; that she judges he would weigh about 200 pounds; that she knows he was sixty-one or sixty-two years old; that prior to the accident he was in the habit of attending to his duties every day as far as witness knew; that she had never known him to be sick; that he was not ill at witness's house; that he lived in the same house with witness for five or six years; that she never knew him before that time; that as far as witness knew, deceased's habits were good; that he was a very ill man from the time of the accident until his death;

that when he was first hurt he complained so much of his side and his limbs; that he was dragged by the cars and his feet were turned in, and the cars pulled him along; that his feet were very much swollen; that he had hemorrhages and vomited blood two or three weeks before he died; that the morning he died he had a dreadful hemorrhage and died right after it; that she was in the room with him; that he was never out of the house after the accident so far as witness knows; that deceased had hold of the car before it started and the car started before he got his feet on the steps; that the car started like any other car starts; that there was no interval that she knows of between the signal to go ahead and the starting of the car.

On cross-examination the witness testified that deceased and his wife had a flat in witness's house; that they did not live in the same family with witness; that they rented the three rooms on the second floor and witness's family lived on the first floor; that deceased and his wife kept house there; that his son, the plaintiff, stayed there sometimes with them; that deceased was in the Postoffice Department all the time that he lived in witness's house; that witness does not remember anyone else getting on at the rear end of the car, and thinks that is the reason deceased went there; that he had a cane or an umbrella in his hand; that deceased took hold of the piece of iron on the rear dashboard of the car with his left hand and started to catch on to the other side of the car, but he did not succeed in getting hold; that he just reached out for it; that he did not get his foot on the steps or his right hand hold of the handle, so far as she saw; that that is the position he was in when the car started; that he did not get his foot on the steps, but was standing there when the car started; that the time his feet were swollen was two or three or four to six weeks before he died; that it was after he was hurt, but witness does not just remember whether it was two or three weeks or perhaps a month, but it was during his illness; that it was some time after he was hurt that she helped to bandage his feet; that witness believes it was just a few days after he was hurt that he began to spit blood; and about perhaps two weeks before he died he had one of the

hemorrhages, and another several days afterward, and the morning he died he had a severe one; that she does not remember distinctly about the time of the hemorrhages except the one he had in the morning when he died; that Dr. Tarkington was his physician; that she had seen Dr. Tarkington there when Mrs. Guenther was ill before the accident happened; that witness does not know of her own knowledge whom he came then to see; that that was three or four years before that time.

Lilian A. Norton testified on behalf of the plaintiff that she was then, and had been for some years, chief clerk of the financial division of the Postoffice Department, and kept the record of attendance of intestate, who was a clerk therein of good business capacity. Intestate was present every day in November to the 30th, and on most of that day. He never took the full thirty days' leave allowed annually. He was absent six days in 1897 on account of sickness, five of these in March and one in December, and was absent on leave December 22, 23, and 24. He was absent, sick, on September 6 and October 3, 1898, and had eight days' leave of absence in June, 1898, but whether sick or not witness did not know. Another witness testified to the good habits of intestate.

Plaintiff then testified that he was the son of the intestate and administrator of his estate. He lived with his father at the time of the injury and took breakfast with him on the morning of November 30, 1898; did not see him again until about 2 p. m., when he found him in bed. He said he was feeling very sick, but did not tell witness that anything had happened to him. He "seemed all right at breakfast that morning, just as usual, feeling hearty and glad, in his usual condition." Witness did not hear of the accident until next morning, when Miss Montgomery told his mother of it. Intestate remained in bed the next morning; said he felt sore and lame, and asked witness to rub him. Witness rubbed him with liniment, and saw black and blue spots all over him, from his knees down. He was bruised all over his body, but witness just rubbed from his knees down. He said his back and chest hurt him, and witness found a big black and blue spot on his side. "He was black and blue all

over his arms and legs; that his legs were skinned black and
blue up to about the thigh; that he also had a black and blue
spot on the abdomen, left side, and on the back, right side, over
the kidneys." The skin was unbroken except on his lower leg;
his feet were not black and blue. Intestate was not the same
man after he was hurt; was weak and lay in bed. The night
before he died witness's mother asked him to sleep with his
father. About 3 A. M. he awoke, went in the bathroom and
found his father there. A gush of blood came from his mouth,
after which he was very weak. Witness "never saw anything
of that kind before; saw him spit up a little blood, but nothing
like the gush there was on that occasion; that this was a few
days after the accident; cannot say how often he saw him spit
blood; cannot say whether he saw it once a week or once a day
in the whole time, but he saw it several times—the first sev-
eral days after he was hurt." He was not with his father all
the time; never saw him spit blood prior to the accident.
"Thinks his condition was pretty good before that; never heard
him complain; was very regular in his attendance at the of-
fice before that, and seemed to be in general good health." He
was in bed after the accident and never went out of the house
afterward, except on December 15, pay-day, he took him down
to the Department to draw his pay. On cross-examination he
stated that no physician had been called for seven or eight days;
thought that Dr. Tarkington had been called before December
15. The large hemorrhage occurred at 3 A. M., and intestate
died about 12; he had several intervening. That was the first
severe hemorrhage that he had; saw him spit blood on several oc-
casions prior to that; but not very much; it did not amount to
much; did not call the doctor when he saw him spit blood a
few days after the accident, because they had home remedies
and thought they would do. His feet and legs were a little
swollen—not very much—when he rubbed him; it might have
been several years before that he noticed that his father's feet
and legs were slightly swollen. Intestate weighed from 240 to
260 pounds.

Mrs. Emma J. Guenther testified that she was the widow of

the deceased, and that they lived on the 30th of November, 1898, at 923 P street N. W.; that the deceased was a clerk in the finance office of the Postoffice Department; that he was a large man and weighed from 230 to 240 pounds; that it was his habit to go daily to the office, and had been for a good many years; that on the 30th of November he got up well in the morning, and ate his breakfast and went to work as usual, but came back about noon of that day and said he was very sick and undressed and went to bed, but did not say anything to her about what the matter was; that he could not eat anything; that he was always afraid of worrying her; that he remained in bed almost all the time after that, and left the house only on the 15th of December to go for his pay, and died on the 15th of January, 1899; that after the accident she bathed him all over that night, and found black and blue spots all over him; that every day she rubbed him, which seemed to relieve him, but only temporarily; that she supposed the bruises disappeared; that on the day of his death he had hemorrhages; that they commenced the night before; it was like vomiting—just burst forth from his mouth; that one minute before he died he walked across the floor in agony; that he could not lie quietly; that he had hemorrhage from the bowels the night before he died, and also from the mouth, she thinks, but is not positive; that he was conscious all the time of his sickness up to the second almost before he died; that he walked across the floor and sat down in his chair and he was dead.

On cross-examination witness testified that the night before he died she saw blood in the vessel under his bed, in the bedroom. She is not positive whether it came from his bowels or his mouth; that she saw no blood from her husband from any source until the night before he died, and the morning of the day he died; those were the only occasions on which she noticed it; that no physician was called for several days after the accident; that Dr. Tarkington came once, and said he would not come again unless they sent him word that it was necessary; that the only time the deceased was dressed after the accident was on the 15th day of December; that he was up and about the

room a part of the time, but not dressed; that she made no objection to his going out on the 15th, as she thought it might do him good; that from the 15th of December on he began to get worse gradually; that she cannot tell how long after the 15th she again sent for Dr. Tarkington, but thinks it may have been a week or two, and after that he came a few times; that the black and blue spots on the deceased were on his side and back, both sides, and on both arms, and all over, and on his stomach and abdomen, and he complained in the pit of his stomach; that he was nearly dead and couldn't eat a mouthful afterward; that the black and blue spots were gradually disappearing, but had not wholly disappeared at the time of his death; that after the accident he was swollen all over, and it never left him entirely; that she had known him to have swollen limbs about the year 1884; that he had some trouble with his heart then, but he was entirely cured and well, and had forgotten all about it; that he had grippe, and it affected his heart; that he also had the grippe in August or September of 1898; that it was not heart disease, but caused from the grippe, and the nerves of the heart were affected; that a day or two before he died his legs swelled; that her husband was in the Postoffice Department from 1882, continuously in the same office, except a short time, when he was transferred to the Civil Service Commission; and that he was sixty-seven years old at the time of his death.

Defendant read in evidence the deposition of Dr. Joseph A. Tarkington, who resided in Indiana and died before the trial. He said that about November 30 or December 15, 1898, he treated intestate for la grippe and disease of heart. He noticed no evidence of internal or external injuries; if there was anything it was made obscure by heart disease and la grippe. Visited him the last fifteen days of his life every day and sometimes two or three times; did not expect him to recover from said diseases. The last few days of illness he suffered from internal hemorrhages; "think they were caused by la grippe and heart disease." His opinion of cause of death was "disease of heart the immediate cause of his death. He also had dropsy, la grippe, and rheumatism. He had heart disease and rheuma-

tism for a year or more, dropsy some months, and la grippe about six weeks prior to his death." "I think the diseases he had were sufficient to cause his death on the 15th day of January, 1899."

To cross-interrogatories, he answered that intestate had been confined to his house on account of disease of his heart several times previous to the accident. Witness was told of the accident; has no recollection of spots or bruises. "From the facts and circumstances of the accident as related to me it suggested the possibility of internal injuries." Examined intestate's legs; they were swollen from dropsy at the time; remembered no further examination. He complained of his arm; had rheumatism; difficult "to say how much pain was due to the rheumatism and how much to the strain." His condition was not due to bruises and injuries rather than to disease. Does not think the hemorrhages due to injuries; he had them only the last few days of life. Remembers no hemorrhages previous to the last few days. Heart disease and la grippe may have caused hemorrhages on account of congested condition of stomach and bowels. Intestate would have suffered from hemorrhages without injuries. His heart had been affected more than a year; valvular deficiency of the æortic valve, caused by rheumatism a year or more before death; not due to nervous shock received. Thinks intestate had called at his office several times during the year previous to his death; remembers that he called at intestate's house several times to see him, but does not remember whether it was within the last year previous to his death.

Dr. Henry D. Fry was called as an expert witness. He knew Dr. Tarkington, who has been out of practice for ten years or longer. To a hypothetical question based on Dr. Tarkington's testimony, he answered: "From the length of time after the accident I should not think that the hemorrhages resulted from the accident, because they would have come on within the first day or two days; whereas it is a very common thing to have hemorrhages from the lungs or other organs in heart disease. If he had dropsy it would show that the circulation was very badly

carried on and that there were enlargements and congestions so that the blood vessels would be liable to break and produce hemorrhages. That is one of the natural conditions following heart trouble." He further said that grippe would weaken the heart still more and precipitate the conditions. The symptoms given were sufficient to account for the hemorrhages and death. Hemorrhages from injuries ought to have occurred within the first day or two days after the accident. If they did not occur within a month or five weeks thinks there was no likelihood that they came from the injury.

On cross-examination he said he would have expected a reversal of the conditions if hemorrhage had resulted from injuries; first, the violent hemorrhage followed in time by the spitting of blood. A man with chronic heart trouble may live for, say, twenty years; it gradually increases and produces ill health. He may keep at active duties until at last the heart is so weak that he has the symptoms mentioned, especially dropsy and finally hemorrhage. The clinical facts point to the hemorrhage as coming from the disease which had reached its final stage.

He further said that with these conditions of disease the accident "could have precipitated and probably precipitated the result." Would not have produced the result "unless organic lesion existed from heart trouble."

If organic lesions existed at the time of injury, "it would have had a bad effect and it would probably have brought on this condition sooner than it would have been brought on if it had been left to the ordinary course of the disease. It may have precipitated it." "If we eliminate the fact of the lesion I cannot account for it" (the hemorrhage).

Plaintiff then called Dr. Philip S. Roy in rebuttal and proposed to show that he had heard the testimony of Dr. Fry, and that he differed therewith. Objection was made because the evidence ought to have been offered in chief, and the court excluded it.

The hypothetical question submitted to Dr. Fry was propounded to the witness and was excluded. Exceptions were regularly reserved.

Plaintiff in rebuttal testified that during the year preceding his father's death he was with him and did not know of his going to Dr. Tarkington's office; it was witness who went there.

Mr. *Lorenzo Bailey* and Mr. *O. H. Budlong* for the appellant.

Mr. *J. J. Darlington*, Mr. *C. C. Cole*, and Mr. *R. S. Huidekoper*, for the appellee:

1. It is contributory negligence *per se* to attempt to board a moving car, especially on the part of one weighing between 240 and 260 pounds, who is suffering from heart disease. He was safely on the ground when the car started. All he had to do to insure his safety was to loose his hand from the car. He did not choose to do this and wait for the next car, as others standing near him did and advised him to do, but chose to hold on to the car and make the effort to board it while it was in motion, and according to all the authorities he assumed all the risks of the undertaking. *Picard* v. *Ridge Ave. Pass. R. Co.* 147 Pa. 195, 23 Atl. 566; *Schmidt* v. *North Jersey Street R. Co.* (N. J.) 49 Atl. 438; *McMurtry* v. *L., N. O. & T. R. Co.* 67 Miss. 601; *Phillips* v. *R. & S. R. R. Co.* 49 N. Y. 177; *McCorcle* v. *Railroad*, 61 Iowa, 555; *Nelson* v. *Railroad*, 68 Mo. 595; *Reidy* v. *Metropolitan Street R. Co.* 58 N. Y. Supp. 326; *Anderson* v. *Third Ave. R. Co.* 36 App. Div. 309; *Weber* v. *New Orleans & C. R. Co.* (La.) 28 So. 892; *Pitcher* v. *Peoples Street R. Co.* 154 Pa. 560, Citing 119 Pa. 70; *Hayes* v. *42d Street R. Co.* 97 N. Y. 259.

2. The accident to the plaintiff's intestate was not the proximate cause of his death. In order that the defendant may be held liable for the death of the plaintiff's intestate the evidence must show an unbroken connection between the injuries received and the death. To constitute actionable negligence, there must be not only a casual connection between the accident complained of and the injury suffered, but such a connection must be by unbroken sequence, so that the negligence must be not

only the cause, but it must be the proximate cause of the injury. *Decatur Car Wheel Co.* v. *Mehaffey,* 29 So. 646; *Milwaukee & St. P. R. Co.* v. *Kellogg,* 94 U. S. 475. The plaintiff has entirely failed to prove that the accident caused the death of his intestate, and without this he cannot recover. The following cases fully sustain this proposition: *Scheffer* v. *Washington City, V. M. & G. S. R. Co.* 105 U. S. 249; *Weber* v. *Third Ave. R. Co.* 12 App. Div. 512; *Grace* v. *Fossett,* 67 App. Div. 443; *Hoey* v. *Metropolitan St. R. Co.* 72 N. Y. Supp. 544; *Seifter* v. *Brooklyn Heights R. Co.* 169 N. Y. 254; *Laidlaw* v. *Sage,* 158 N. Y. 73; *Tennant* v. *Travelers' Ins. Co.* 31 Fed. 322.

3. Where the facts are undisputed and the intervening agency is manifest, it is not error for the court to take the question of natural and proximate cause from the jury. *Hoague* v. *Lake Shore Ry. Co.* 85 Pa. 293; *Pike* v. *Grand Trunk R. Co.* 39 Fed. 255; *Louisville & N. R. Co.* v. *Keith,* 58 S. W. 486; *I. B. & W. R. Co.* v. *Birney,* 71 Ill. 392; *Medbury* v. *New York & E. R. Co.* 26 Barb. 564; *Daniels* v. *New York, N. H. & H. R. R. Co.* 183 Mass. 393; *Gay* v. *Union Mut. Ins. Co.* 9 Blatchf. 154; *Houston* v. *Traphagan,* 47 N. J. L. 23; *Omaha & R. V. R. Co.* v. *Brady,* 39 Neb. 27; *Standard Life & Acci. Ins. Co.* v. *Thomas,* 12 Ky. L. Rep. 715; *Cole* v. *German Sav. & L. Soc.* 124 Fed. 122.

4. The admission of the testimony of Mercheimer and Hoover was not error, but if it had been, it was not prejudicial to the plaintiff, for the result of the trial would have been the same had this testimony been received or rejected. Jones, Ev. § 900; *Thorndike* v. *Boston,* 1 Met. 242; *Scullin* v. *Harper,* 78 Fed. 460; *Smith* v. *Russ,* 22 Wis. 439; 66 Am. Dec. p. 717; note in *Latteratt* v. *Cook,* 63 Am. Dec. 428–434, and *Lucas* v. *New Bedford R. Co.* 66 Am. Dec. 406.

5. The refusal of the trial court to permit the plaintiff to examine Dr. Roy on a hypothetical question, after the defendant had rested his case, was not error and is no ground for reversal. It was clearly evidence in chief and not in rebuttal. *Wells* v. *Burbank,* 17 N. H. 393; *Bacon* v. *Williams,* 13 Gray, 525;

*Kirchlion* v. *Bouzel,* 67 Wis. 178; *San Francisco Breweries* v. *Schurtz,* 104 Cal. 420; Jones, Ev. § 811; *Marshall* v. *Davies,* 78 N. Y. 414; *Hastings* v. *Palmer,* 20 Wend. 225; *Hathaway* v. *Hemingway,* 20 Conn. 191; *Willard* v. *Pettit,* 153 Ill. 663. It is within the discretion of the trial court to permit a party to introduce evidence out of the regular order. It is certainly not a matter of right that a party should be permitted to depart from the regular order of proof. *McDermott* v. *Chicago R. R. Co.* 85 Wis. 102; *Wood* v. *Gibbs,* 35 Miss. 559; *Marshall* v. *Davies,* 78 N. Y. 414; *Gibson* v. *Johnson,* 21 Misc. 59; *Henry* v. *Lowell,* 16 Barb. 268; *Rosquist* v. *Furniture Co.* 50 Minn. 192; *Finn* v. *Prov. Gas Co.* 99 Pa. 631; *Stewart* v. *Smith,* 111 Ind. 526; *Hills* v. *Ludwig,* 46 Ohio St. 373; *Peyton* v. *Morgan Park,* 172 Ill. 102; *Insurance Co.* v. *Thompson,* 94 Ky. 253. A party can never insist, as a matter of right, that a case shall be reopened for the introduction of evidence. *Alexander* v. *Byron,* 2 Johns. Cas. 318; *Cushman* v. *Coleman,* 92 Ga. 778; *Bertha Zinc Co.* v. *Martin,* 93 Va. 791.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The conditions under which a case may be withdrawn from the jury are well established. See *Adams* v. *Washington & G. R. Co.* 9 App. D. C. 26, 31, and cases there cited.

Without their restatement it is sufficient to say that this judgment ought to be reversed unless it is plain from the evidence in the record—so plain that all reasonable minds must fairly reach the same conclusion—that the plaintiff has failed to make out a case sufficient in law to support a verdict in his favor.

Three issues of mixed law and fact are involved, and plaintiff's failure on any one of these to make out a case requiring its submission to the determination of the jury, with appropriate instructions respecting the law applicable thereto, would justify the direction to find a verdict for the defendant.

Those issues are: (1) Was the defendant guilty of negligence?

(2) Were the injuries of the plaintiff's intestate caused or contributed to by his own negligence?

(3) Were the injuries received the proximate cause of his death?

2. Undoubtedly, the first issue ought to have been submitted to the jury.  The evidence shows, without contradiction, that the cars, though crowded, were stopped to take on passengers at the regular stopping place while plaintiff's intestate and some others were there waiting to take passage.  Just as he grasped either the upright wooden bar on one side of the step, or the iron handle on the other—it is immaterial which—and was in the act of raising his foot to the step the bell rang and the car started.  He was not thrown down but was dragged across the street, because he retained his hold and was assisted by one or more passengers who stood upon the platform of the moving car.  Plaintiff's intestate and one of the witnesses stood while from three to five crowded cars passed.  When this train came witness suggested that he should wait with her for another, but he said he would be late.  Several ladies got on the car at the same place and a witness standing on the platform says that intestate stepped back for them to get on first.  He was a large, heavy man and the witness who had been waiting with him was watching him because she feared he would be left.  This witness says that the conductor was at or near the front of the rear car, and that he did not see the intestate because he did not look back.

It is well settled that when a car has been stopped to let passengers get off it is the duty of the conductor to see that each one is safely off before giving the signal to start.  He is bound to look and should not be engaged in anything that would prevent this observation.  *Harmon* v. *Washington & G. R. Co.* 7 Mackey, 255, 147 U. S. 571, 37 L. ed. 284, 13 Sup. Ct. Rep. 557; *Metropolitan R. Co.* v. *Jones,* 1 App. D. C. 200, 207.  For equally as strong a reason, when a car has been stopped to take on passengers, it is the duty of the conductor to see that all are safely on before giving the signal to start.  It is his duty to watch both ends of the car, and he has no right to assume that all persons are equally strong and active, and that the last one must be safely on, because in his opinion sufficient time has been given.

That the cars may be so crowded as to make it difficult or impossible for him to make the necessary observation while within the car is no excuse. That fact would seem, if anything, to increase the burden of his duty because of the consequent impediment to rapid egress and ingress. If, then, he started the car whilst intestate had hold of either handle and was attempting to enter, he was guilty of negligence.

3. Assuming, as we must from the evidence before recited, that the intestate had grasped the bar or hand rail in an attempt to get on the car before it was put in motion, it was for the jury to say whether the injuries which he received were the result of his own want of care in not releasing his grasp in time to prevent being thrown to the pavement or dragged along as he was. Whether he had sufficient time for the exercise of judgment as to the proper course to pursue, or whether he might reasonably have concluded, if he had sufficient time to think and act, that it was as safe to hold on as to turn loose, were questions eminently proper for the determination of the jury. Whether he exercised the care reasonably to be expected of an ordinary person at the time is to be determined from all the surrounding circumstances, among which are the conditions of emergency under which he was called upon to act. *Washington & G. R. Co.* v. *Hickey,* 5 App. D. C. 436, 471, 166 U. S. 521, 41 L. ed. 1101, 17 Sup. Ct. Rep. 661.

4. The serious difficulty in this case arises under the third question, Was it error to refuse to submit to the determination of the jury whether, under all of the evidence, the death of intestate was caused by the wrongful act, neglect, or default of the defendant as required by the statute conferring a right of action in such case upon his personal representatives?

In other words, was it so plain that the death on January 15, 1899, was not proximately caused by the injuries received November 30, 1898, but resulted from an independent, intervening cause, that the court was justified in withdrawing the question from the jury?

It cannot be successfully, and we do not understand it to be seriously, maintained that the evidence offered by the plaintiff

in chief was manifestly insufficient to warrant the inference that the injuries were the proximate cause of death.

Consequently, when the plaintiff rested the defendant did not move to withdraw the case from the jury, but undertook the burden of proving that death was the consequence of an intervening, independent cause without which it would not have occurred.

This intervening agency, which its testimony tended to show was the predominant and efficient cause of the death, was pre-existing heart disease.

It seems to be settled by the Supreme Court of the United States that a case may be withdrawn from the jury, not only where the plaintiff's evidence is plainly insufficient to support a verdict, but also where the whole evidence, including that introduced by defendant as well as plaintiff and offering no substantial dispute on material points, is of such conclusive character that the court in the exercise of a sound judicial discretion would be compelled to set aside a verdict returned in opposition to it. *Delaware, L. & W. R. Co.* v. *Converse,* 139 U. S. 469, 472, 35 L. ed. 213, 215, 11 Sup. Ct. Rep. 569; *Randall* v. *Baltimore & O. R. Co.* 109 U. S. 478, 482, 27 L. ed. 1003, 1005, 3 Sup. Ct. Rep. 322; *Union P. R. Co.* v. *McDonald,* 152 U. S. 262, 284, 38 L. ed. 434, 443, 14 Sup. Ct. Rep. 619.

It remains, therefore, to consider whether, under appropriate application thereto of the maxim, *Causa proxima non remota spectatur,* the evidence tending to show that heart disease was the direct, proximate cause of death, is of the required character to sustain the direction of a verdict responsive to it. In considering this vexed question of proximate and remote cause, in a case where damages had been recovered for the destruction of plaintiff's mill and lumber by fire communicated thereto from a distant elevator that had been set on fire through the negligence of the defendant whilst an unusually strong wind was blowing in their direction, it was said by Mr. Justice Strong, speaking for the Supreme Court of the United States:

"The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question

of science or of legal knowledge. It is to be determined as a
fact in view of the circumstances of fact attending it. The pri-
mary cause may be the proximate cause of a disaster, though it
may operate through successive instruments, as an article at the
end of a chain may be moved by a force applied to the other end,
that force being the proximate cause of the movement, or as in
the oft-cited case of the squib thrown in the market-place. * * *
The question always is, Was there an unbroken connection be-
tween the wrongful act and the injury, a continuous operation?
Did the facts constitute a continuous succession of events, so
linked together as to make a natural whole, or was there some
new and independent cause intervening between the wrong and
the injury? It is admitted that the rule is difficult of applica-
tion. But it is generally held that, in order to warrant a finding
that negligence or an act not amounting to wanton wrong, is the
proximate cause of an injury, it must appear that the injury was
the natural and probable consequence of the negligent or wrong-
ful act, and that it ought to have been foreseen in the light of
the attending circumstances. * * * We do not say that even
the natural and probable consequences of a wrongful act or
omission are in all cases to be chargeable to the misfeasance or
nonfeasance. They are not when there is a sufficient and inde-
pendent cause operating between the wrong and the injury. In
such a case the resort of the sufferer must be to the originator of
the intermediate cause. But when there is no intermediate ef-
ficient cause, the original wrong must be considered as reaching
to the effect, and proximate to it. The inquiry must, therefore,
always be whether there was any intermediate cause discon-
nected from the primary fault, and self operating, which pro-
duced the injury. Here lies the difficulty. But the inquiry
must be answered in accordance with common understanding.
In a succession of dependent events an interval may always be
seen by an acute mind between a cause and its effect, though it
may be so imperceptible as to be overlooked by a common mind.
* * * In the nature of things there is in every transaction a
succession of events, more or less dependent upon those preced-
ing, and it is the province of a jury to look at this succession of

events or facts, and ascertain whether they are naturally and probably connected with each other by a continuous sequence or are dissevered by new and independent agencies, and this must be determined in view of the circumstances existing at the time." *Milwaukee & St. P. R. Co.* v. *Kellogg,* 94 U. S. 469, 474, 476, 24 L. ed. 256, 258, 259.

The conclusion that heart disease was undoubtedly the proximate cause of intestate's death rests upon the evidence of the attending physician and the opinion of an expert founded thereon.

The witness had retired from practice some years before and removed to Indiana. The expert, who knew him, testifying on the trial in June, 1903, said that he had been out of practice for ten years or more. However, as the witness had attended upon intestate between four and five years before, this must be taken to mean that he had not given up all practice at that time. The physician's entire evidence is contained in his answers given to written interrogatories propounded by both parties, and his deposition was taken more than two years after the patient's death.

The witness apparently testified from a general recollection, without the aid of records or memoranda of his visits, his observation of conditions, and treatment. This may account for his statement showing but a slight examination of the patient, and his failure to remember the existence of the bruises and discolorations upon his body and limbs that were testified to by his wife and son. He seems to have attached no importance to the injuries which his patient had received, although he remembered having been told of the accident, and was not able to say whether the pain complained of in his arm was due to the strain or to rheumatism. He had no recollection of the patient's spitting blood shortly after the accident, of which others had testified, and the first hemorrhage remembered occurred within a few days before the death. He was positive in the statement that intestate's heart was diseased more than a year before the accident—disease due to valvular deficiency of the heart caused by rheumatism, and which gradually increased. Upon this knowledge and the facts stated as to the effects of the injuries

received, he expressed the opinion that the death was the result of the disease of the heart. In connection with the contradiction of the witness respecting the injuries of the intestate, and their immediate effect, there was other evidence tending to show his general good health for several years before the accident and on the day of its occurrence.

He was sixty-seven years old, had never availed himself of the annual vacation of thirty days allowed by law to all department clerks, and, as shown by the record kept by the chief of his division, he was absent under report of sickness for three days in 1898, prior to November 30, namely, March 10, September 6, and October 3.

Intestate's wife and son both testified to his general health and strength before November 30. There was direct evidence also that he was badly bruised on that day, came home suffering great pain, and was confined to the house, most of the time in his bed, until death occurred. The testimony as to the spitting of blood a few days after his injuries were received has been before referred to.

Upon a statement of the facts as presented by the physician's deposition, the expert, as noted in the statement of his evidence, expressed the positive opinion that the death was caused by the pre-existing heart disease. On cross-examination based on statements made by plaintiff's witnesses, he adhered to this opinion. He said that a man might live for years with heart disease gradually progressing; that he might keep at active work until at last the heart becomes weak as shown by dropsy, and final hemorrhage. He further said that admitting this diseased condition at the time of the accident, with injuries as testified to by plaintiff's witnesses, those injuries "could have precipitated, and probably precipitated the result."

Forced by conditions of the case to pass upon the conclusive force of this evidence, as matter of law, we are not to be understood as expressing any opinion as regards the weight that ought to be given to it by a jury properly charged with its determination.

Granting that death came finally from hemorrhage superin-

duced by the diseased condition of the intestate's heart, and the strong probability that heart disease, incipient before the receipt of the injuries, was the proximate cause of death, it is sufficient, for all the purposes of this appeal, to say that in our judgment the evidence is not so far undisputed and of such conclusive character as to permit no other conclusion than that a pre-existing diseased condition of the heart was the certain, predominant, and efficient cause. In other words, were this an appeal from a judgment rendered on behalf of the plaintiff we would not regard it as our duty to set the verdict aside.

We regard this case as clearly distinguishable from those upon which the appellant most strongly relies, and the most important of which will be briefly considered:

(1) *Scheffer* v. *Washington City, V. M. & G. S. R. Co.* 105 U. S. 249, 26 L. ed. 1070, was a case where the intestate, hurt December 7, 1874, some time thereafter became insane from his injuries and committed suicide on August 8, 1875. A demurrer to the declaration was sustained and the judgment was affirmed on the ground that suicide resulting from insanity was not the natural and probable consequence of the defendant's act of negligence.

(2) *Daniels* v. *New York, N. H. & H. R. Co.* 183 Mass. 393, 62 L. R. A. 751, 67 N. E. 424. In that case also the intestate died by his own hand, two months after the receipt of injury. The court in deciding against the plaintiff said: "We are of opinion that the liability of a defendant for a death by suicide exists only when the death is the result of an uncontrollable impulse, or is accomplished in delirium or frenzy caused by the collision, and without conscious volition to produce death, having knowledge of the physical nature and consequences of the act."

(3) *Seifter* v. *Brooklyn Heights R. Co.* 169 N. Y. 254, 62 N. E. 349. There the intestate sustained a fracture, and died nearly five months thereafter from what was claimed to be septic pneumonia. The judgment against the plaintiff was affirmed, three of seven judges dissenting. In the majority opinion it was said that the first link in the chain was to establish infection at the point of fracture, and that there was no evidence thereof.

In the foregoing cases death was due solely to an independent, intervening cause; that is to say, a cause arising after the injury sustained through the defendant's negligence, but yet not reasonably and naturally traceable thereto.   In this case, as in some others to which attention will be called, the alleged proximate cause existed, to some extent at least, before the act of negligence occurred; and the right of the plaintiff, therefore, does not depend upon proof showing that this new cause was the reasonable and natural consequence of the injury as a primal cause, but upon whether it has been made to appear that death was the reasonable, natural consequence of the injury, notwithstanding it would inevitably have resulted, sooner or later, from the pre-existing disease.   "The law wil. not go farther back in the line of causation than to find the active, efficient, procuring cause, of which the event under consideration is a natural and probable consequence, in view of the existing circumstances and conditions.   The law does not consider the cause of causes beyond seeking the efficient predominant cause, which, following it no farther than those consequences that might have been anticipated as not unlikely to result from it, has produced the effect.   An injury which might naturally produce death in a person of a certain temperament or state of health is the cause of his death, if he dies by reason of it, even if he would not have died if his temperament or previous health had been different; and this is so, as well when death comes through the medium of a disease directly induced by the injury as when the injury immediately interrupts the vital processes."   The foregoing is extracted from the opinion of the court in a case involving liability under a policy of accident insurance.   The insured died of peritonitis, which he had had in the same part previous to the accidental fall, and it was proved that effects had been produced which rendered him liable to a recurrence of it.   Plaintiff's evidence tended to show that the recurrence of the disease was induced by the fall.   A judgment for the plaintiff was affirmed.   *Freeman v. Mercantile Mut. Acci. Asso.* 156 Mass. 351, 353, 17 L. R. A. 753, 30 N. E. 1013.   It is true, it was said in the charge in that case, that if the insured was then suffering from the disease

which was aggravated and made fatal by the fall, he could not recover, for the accident would not then be the proximate cause of death "in the sense of the policy." "But if," it was added, "owing to existing lesions caused by that disease, but not having the disease at the time, the same kind of malady, that is, peritonitis, was started up, the company are to be answerable, although if there had been a normal state of things the fall would not have occasioned such a result."

Whatever the rule may be in an action depending upon the construction of a contract of insurance against accident, under certain limitations and exceptions, as to liability where the death was from disease, "aggravated and made fatal" by accident, we do not think that it can apply in an action of tort for the benefit of a wrongdoer. *Louisville & N. R. Co.* v. *Jones,* 83 Ala. 376, 382, 3 So. 902. In that case, in which the defense to an action for the death of a passenger was that pneumonia was the proximate cause, it was said: "Even if Mrs. Jones had pneumonia or incipient pneumonia, at the time she received the injury, and it could be known that she would ultimately die of that disease, this would not necessarily and as a matter of law relieve the railroad of all responsibility. If the injury was caused by the negligence of the railroad company, under the rules declared above, and if it contributed to and hastened her death, then the corporation would not be guiltless." See also *Thompson* v. *Louisville & N. R. Co.* 91 Ala. 496, 11 L. R. A. 146, 8 So. 406; *Jeffersonville, M. & I. R. Co.* v. *Riley,* 39 Ind. 568, 582; *Terre Haute & I. R. Co.* v. *Buck,* 96 Ind. 346, 350, 49 Am. Rep. 168; *Beauchamp* v. *Saginaw Min. Co.* 50 Mich. 163, 174, 45 Am. Rep. 30, 15 N. W. 65; *Baltimore City Pass. R. Co.* v. *Kemp,* 61 Md. 74, 81.

In the case last cited the plaintiff sued for injuries sustained through the negligence of the defendant while being carried as a passenger. There was evidence tending to show that cancer resulted from a blow received on her breast. The question was whether this could be considered by the jury as a probable, natural result of the injury. In affirming the judgment for the

plaintiff it was said by Chief Judge Alvey (now Chief Justice of this court) that:

"It is the common observation of all that the effects of personal physical injuries depend much upon the peculiar conditions and tendencies of the persons injured, and what may produce but slight and comparatively uninjurious consequences in one case may produce consequences of the most serious and distressing character in another. And this being so, a wrongdoer is not permitted to relieve himself from responsibility for the consequences of his act by showing that the injury would have been of less severity if it had been inflicted upon any one else of a large majority of the human family. Hence the general rule is that in actions of tort like the present, the wrongdoer is liable for all the direct injury resulting from his wrongful act, and that too although the extent or special nature of the resulting injury could not, with certainty, have been foreseen or contemplated as the probable result of the act done. . . . That the female plaintiff may have had a tendency or predisposition to cancer can afford no proper ground of objection. She, in common with all other people of the community, had a right to travel or be carried in the cars of the defendants, and she had a right to enjoy that privilege without incurring the peril of receiving a wrongful injury that might result in inflaming and developing the dormant germs of a fatal disease. It is not for the defendants to say that because they did not, or could not, in fact, anticipate such a result of their negligent act, they must therefore be exonerated from liability for such consequences as ensued. They must be taken to know and to contemplate all the natural and proximate consequences, not only that certainly would, but that probably might flow from their wrongful act. The defendants must be supposed to know that it was the right of all classes and conditions of people, whether diseased or otherwise, to be carried in their cars, and it must also be supposed that they knew that a personal injury inflicted upon any one with predisposition or tendency to cancer might, and probably would, develop the disease."

Assuming that before the date of the accident the intestate

had heart disease so far developed that by the established natural law of that disease it would gradually have brought on a fatal hemorrhage at some indefinite future period, he had, nevertheless, the right to offer himself as a passenger on defendant's cars at a proper place and time, and to demand the exercise of due care whilst in act of availing himself of his right.

If, then, by the direct agency of a wrongful act, the inevitable, final result of his disease was brought about, or necessarily hastened, or, in the language of defendant's expert witness, "precipitated," the wrongdoer who set the intermediate agency in motion can not escape responsibility. In such a case the wrongful act, intervening between the incipient disease and its ultimate result, becomes, in the contemplation of law, the proximate cause.

5. Two other assignments of error relate to the admission of certain evidence offered by the defendant through its claim agent and another to show that no reports of the accident had been made to the defendant by its employees, and that it had not been able to hear of any one who knew anything about the accident, etc., and to the exclusion of the evidence of the expert witness offered by the plaintiff to rebut the opinion expressed by the defendant's expert.

The evidence of the two agents was calculated to do little or no harm to the plaintiff and little good to the defendant; but they ought not to have been permitted to testify over the objection of the plaintiff.

For reasons given in part in *Robinson* v. *Parker,* 11 App. D. C. 132, we incline to the view that the testimony offered by the plaintiff in rebuttal ought to have been admitted.

For the error in directing the verdict for the defendant the judgment will be reversed with costs, and the cause remanded with direction to grant a new trial; and it is so ordered.

*Reversed.*